UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA :
:
v. : No. 2:12-cr-00012-wks-2
:
Haywood Mack :

**OPINION & ORDER**

Defendant Haywood Mack is charged with knowingly and intentionally conspiring to distribute twenty-eight grams or more of cocaine base, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841 (a)(1), 841 (b)(1)(B), and 846 (2006). Mack filed a motion to suppress identification and a motion to suppress certain statements he made on December 29, 2011. The Government opposes both motions. For the reasons stated below, this Court **denies** both motions.

**I. FACTUAL SUMMARY**

William Parker was arrested and charged in Vermont Superior Court with a narcotics offense in September 2011. During an interview, Parker advised officers that he had sold crack cocaine, powder cocaine, and heroin in Burlington since June 2011. Parker further stated that he and Mack reported to David Clark, that Clark had been incarcerated in Vermont for selling drugs in the past, and that Clark was in Vermont to check on things. Parker informed officers that Clark drove a silver

Lincoln and had a criminal record in North Carolina.  Drug enforcement agents in North Carolina confirmed Parker's story.

On November 7, 2011, officers stopped a silver Lincoln sedan with a North Carolina license plate.  David Clark was driving the vehicle.  Two days later officers stopped a white Land Rover with New York plates registered to Sharon Mack.  David Clark was operating the Land Rover and Haywood Mack was in the front passenger seat.  During a search of the vehicle, Officers did not discover drugs or drug paraphernalia.

On December 5, 2011, officers observed Mack in the Land Rover outside the Anchorage Inn in South Burlington.  A short while later, Parker arrived at the hotel and entered the Land Rover.  Mack and Parker then made several short stops in and around Burlington before returning to the Anchorage Inn.  Shortly after they returned to the hotel, Clark arrived in the silver Lincoln.  When several marked cruisers arrived at the hotel, Mack and Parker exited the vehicle and went into the hotel and Clark drove off in the silver Lincoln.

On December 13, 2011, officers followed the Land Rover from Cherry Street in the vicinity of the Costello courthouse to the La Quinta Inn on Williston Road.  Detective Merchand and Sergeant Burke watched two women enter the hotel's rear entrance.  Sergeant Burke identified one of the women as Julie

2

Sweeney. Some ten minutes later the other woman exited the hotel. Merchand approached her as she left.

The woman was Kamie Morrison. Sitting in the passenger seat of her vehicle, Merchand asked whether she purchased crack cocaine in the room. Morrison told him that she had not but later admitted that she exchanged marijuana for crack cocaine. Morrison said that Swiff (an alias for Parker) let her into the hotel and took her to a room on the second floor. There, she observed several individually wrapped plastic baggies of crack cocaine in the room, which she described as "ready to sell." She accurately identified the other woman in the room and stated that there were two African American males in the room other than Swiff. She described the first man as a young African American male; she knew the other man was "B-Low" (an alias for Mack). She described B-Low as an African American in his mid-thirties with medium height and medium build. At the December 11 hearing, she noted that the room was well lit.

This was not the first time that Morrison met B-Low. At the hearing, Morrison stated that she first met B-Low in the Lowes parking lot in Essex, Vermont when she exchanged marijuana for crack cocaine in the back of a car. On another occasion, she and B-Low smoked blunts in her bedroom. Both times were during daylight hours and both times she was within three feet of B-Low.

3

At the end of her talk with Merchand, Morrison agreed to make controlled purchases of crack cocaine from the three men in the hotel room for monetary compensation. The first controlled exchange took place the following day, on December 14, 2011. Morrison called B-Low with a number he had given her (802-310-0575) at around 4:30 P.M. The conversation went as follows:

    Morrison: "B-Low!"

    B-Low: "What's up baby?"

    Morrison: "Baby, it's Kamie, I need to come get that ball[1] . . . can I come see you?"

    [The two negotiated a price for the ball.]

    B-Low: "Listen, come by—you know where um the Barnes and Noble is at on Dorset?"

    Morrison: "Yes."

    B-Low: "Alright, come there, my little home boy is gonna get in the car with you and he's gonna take care of that."

    Morrison: "Uh—do you trust this person? Who is he?"

    B-Low: "He's my partner! . . . He was with me the day I met you. . . . He was the one you sat in the back seat with."

    Morrison: "Oh, the young kid. Okay."

("CI Call to Mack," Ex. 1).

Merchant provided Morrison with money to make the purchase and a wire to record the conversation. Morrison drove to the Barnes and Noble. A white Lincoln SUV with New York plates and

---

1. A "ball" is 3.5 ounces of crack cocaine.

registered to Sharon Mack entered the parking lot.  A person later identified as "Dolo" exited the front passenger side door and entered Morrison's car.

Morrison completed the controlled purchase with Dolo.  Before he exited the vehicle, Dolo told her that "Bam" was leaving and that he, Dolo, was in charge.  He gave her his number and told her that he would be at the Anchorage hotel if she needed anything.  Dolo returned to the Lincoln.  Morrison called Merchant and left the parking lot, but before she could get away, the Lincoln flashed her down.  She got out of the vehicle and walked up to the driver's window.  B-Low was driving the Lincoln.  Claiming that the package was too heavy, B-Low asked for fifty dollars more or for her to remove a piece from the bag.  Morrison said that she would reimburse them later. ("CI Buy from Daggs thru Mack," Ex. 2).  B-Low agreed, and Morrison drove back to the police station.

After returning to the station, Morrison gave the crack cocaine to law enforcement officers.  With packaging, the bag she purchased weighed 2.3 grams.  Morrison then received a call from B-Low, which officers recorded:

Morrison: "Hello"

B-Low: "Hey baby."

Morrison: "Hey baby what's up?"

5

> B-Low: "I was just calling to tell you [that] you don't owe me anything. That's the hook up."
>
> Morrison: "Thank you. My bad. My bad. I counted it in front of him. . . . Alright, baby. You're good. I hope to see you soon."
>
> B-Low: "All you need to do is bring me that business."
>
> Morrison: "Okay, but when do I see you again?"
>
> B-Low: "I'll be back in about two days, but it's all the same. That's my boy."
>
> Morrison: "I'll see you in a couple of days."
>
> B-Low: "That's me right there. That's me."
>
> Morrison: "I got him. I got him. I got his number."
>
> B-Low: "Alright. That's me. He's up here with me."
>
> Morrison: "Alright, I'll talk to Dolo when I need him."
>
> B-Low: "And it will always be top of the line."

("Incoming Call Mack to CI Post Purchase," Ex. 6).

At the end of the phone call, Merchand showed Morrison a single digital photo on his cell phone. Morrison identified the man depicted in the photograph as B-Low. Merchand recorded the identification:

> Merchand: "Ms. Morrison did you recognize that subject?"
>
> Morrison: "Yes, that was *Bi*-Low."

("CI ID of Mack Photo," Ex. 4).

On December 21, 2011, Morrison performed a second controlled purchase of crack cocaine from Dolo. The conversation was recorded. After the transaction, Morrison took

6

Dolo to Price Chopper. On the ride over, she asked when B-Low was returning. Dolo responded: "He is getting on our fucking nerves." After some time, the topic of B-Low came up again:

    Morrison: "So is he coming up? . . . Will he call me when he gets here?"

    Dolo: "Yeah, definitely. He's getting on our nerves. . . . He thinks he's the boss and he's not the boss."

    Morrison: "He's not? I thought he was."

    Dolo: "The fuck he ain't."

    Morrison: "He acts like y'all are workin for him. . . . That's what he told me."

    Dolo: "Reggie and Swiff, we got our own shit. What the hell is he talking about?"

    Morrison: "He told me that I didn't have to deal with Reggie or Swiff anymore, that I could deal directly with him, which I'd rather not."

    Dolo: "That's what we were just arguing about with him on the phone, like 'stop telling people that you are the boss: You're not the boss, bam. And further, who wants the title of being the boss? Police will get your ass Mr. Boss Man. . . . He was doing that shit where we were from and girls looking at him like he was dumb."

("Recording of Controlled Purchase," Ex. 7).

Dolo exited the vehicle at Price Chooper. When he returned, he and Morrison began discussing a person named, "Bam."

    Dolo: "Oh man, yeah, Bam we was all arguing on the phone with Bam—me and Swif was."

    Morrison: "Bam?"

7

Dolo:       "Yeah, Bam was like—"

Morrison:   "I haven't seen Bam in years."

Dolo:       "[discussing what Bam said] 'I think I need to come down and control things.' I said, 'we don't need you down here.'"

Morrison:   "Bam said that?"

Dolo:       "Yeah, I said 'we don't need you down here, man.'"

Morrison:   "Bam going [to] fuck something up in a heartbeat."

Dolo:       "Yeah, he will."

Morrison:   "I'm telling you. How long have you known him?"

Dolo:       "Guess what Swiff told him on the phone. Swiff said, 'the only thing you going to come down here and do is fuck up money and chase after chicks that don't want to fuck you.'"

Morrison:   "Bam's not in Vermont anymore?"

Dolo:       "No."

Morrison:   "Uh, I haven't seen—actually, it's been a year, year and a half. He was living downtown—him and Jess were—they were just getting out of jail and—uh he's a good shit."

Dolo:       "You're talking about the other Bam. You're talking about B."

Morrison:   "No, I was just—where's he live?"

Dolo:       "The one that thinks he is the boss."

Morrison:   "Oh, oh that one."

Dolo:       "That B."

Morrison:   "Oh, ok, there's two of them then."

> Dolo: "I know. I know the other one too."
>
> Morrison: "You know the other one?"
>
> Dolo: "Yes. Thinks he controls me and Swiff."
>
> Morrison: "Who, B? I just know him as B-Low, so B-Low and Bam are the same person?"
>
> Dolo: "Yeah, it's B-Low. Yeah. I'm Dolo he's B-Low."

("Recording of Controlled Purchase," Ex. 7).

On December 29, 2012, Detective Merchand and other Burlington police officers stopped a white Land Rover traveling over the speed limit on I-89 between exits thirteen and fourteen. Mack was driving the Land Rover and Dain Blair was the sole passenger. The officer that stopped the vehicle smelled marijuana.

Merchand questioned Mack and Blair on the side of the road. Mack told Merchand that he came to Vermont to visit a friend, James Sanders. Mack claimed that they planned to meet Sanders at a gas station before going to a club. He admitted that he had smoked marijuana before driving. Mack told Merchand that the car was registered to his wife, a dispatcher for the New York Police Department. A drug-sniffing dog alerted Merchand to the presence of narcotics in the vehicle.

Merchand informed Mack that he was concerned that there may be drugs in the vehicle. He told Mack that he was going to call a tow truck and apply for a search warrant. Indignant, Mack

9

reiterated that nothing was in the vehicle and invited Merchand to search the car on the side of the road.

Mack consented and told Merchand that he wanted to stay with his vehicle. Merchand repeatedly informed Mack and Blair that they could walk away from the scene, that he could call them a cab, that they could call themselves a cab, or that he could give them a ride. Before they left the scene, Merchand obtained Mack's and Blair's contact information. Mack quickly gave Merchand his home number and one of his cell phone numbers, but hesitated to give the number to his other cell phone. The other number was 802-310-0575, the same number that Morrison obtained from B-Low and used to make the first controlled purchase. When the tow truck arrived, Mack yelled "I'm not under arrest," and Merchand responded, "this is correct, you and I know that."

After the tow truck arrived, Merchand, Mack, and Blair got into the police car. Merchand offered Mack the front seat. He told both men that the he was towing their car downtown, near the clubs. Excited, Mack asked whether he could walk to a club while they searched the vehicle. Merchand responded that if they were going to leave the car he would need to obtain a search warrant because Mack would not be able to revoke consent if he was not with the vehicle. Mack and Blair told Merchand that they would not revoke, but Merchand insisted that he would

have to obtain a warrant if they left. Both men reiterated their desire to remain with the vehicle.

When they arrived at the station, Merchand left Mack, Blair, and the microphone with Detective Young. Detective Young again told both men that they could revoke their consent and leave at any time. While Young was watching the men, Blair twice referred to Mack as "Bam."

Merchand completed the search of the vehicle in less than two hours. He located some documents of little value and some marijuana residue. Mack and Blair left in the Range Rover. ("Traffic Stop & Interaction with Mack," Ex. 8).

## II. DISCUSSION

### A. Motion to Suppress Identification

Mack first moves to suppress Morrison's identification, arguing that the out-of-court identification was so suggestive that neither it nor an in-court identification may be admitted. The Government concedes that showing Morrison one photo was unduly suggestive, but argues that the identification is admissible because it was nonetheless reliable.

Prior identifications are generally admissible under section 801(d)(1)(c) of the Federal Rules of Evidence. However, admitting unreliable identification testimony violates the Due Process Clause. *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). The Due Process Clause requires that identification

11

testimony be excluded "only if it was *both* produced through an unnecessarily suggestive procedure *and* unreliable. Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if when viewed in the totality of the circumstances, it possess sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir. 1994) (emphasis in original) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d. Cir. 1991)).

Courts determine the admissibility of identification testimony by making two inquires. First, courts must determine whether the identification followed unduly and unnecessary suggestion that the defendant was the perpetrator. *Brisco*, 565 F.3d at 88. "[A]n identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create 'a very substantial likelihood of irreparable misidentification.'" *Id.* (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Absent exigent circumstances, an identification based on the display of a single photograph is considered unduly suggestive. *Wiggins v. Greiner*, 132 Fed. App'x. 861, 864 (2d Cir. 2005) ("[T]his court has 'consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the

procedure, as an unnecessarily suggestive one.'") (quoting *Mysholowsky v. People*, 535 F.2d 194, 197 (2d Cir. 1976)).

If the procedures were not unduly and unnecessarily suggestive, courts need not consider the second inquiry because "the identification presents no due process obstacle to admissibility." *Brisco*, 565 F.3d at 88 (internal quotation and citation omitted). However, if the procedures were suggestive courts must consider whether the identification was nonetheless reliable. *Id.* In ascertaining whether identification testimony is nonetheless reliable, courts continue to look to the factors outlined in *Neil v. Biggers*:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

409 U.S. 188, 199–200 (1972).

The Government concedes that Morrison's out-of-court identification was unnecessarily suggestive, so the Court must consider whether the identification was independently reliable.

Three of the five factors clearly suggest that there was not a high likelihood of misidentification. First, Morrison had several opportunities to view Mack in broad daylight and at close range. *See Dunningham v. Keane*, 137

F.3d 117, 129 (2d Cir. 1998) (finding an identification reliable in part because the witness first saw the defendant in broad daylight from five feet away). Second, Morrison purchased drugs from Mack; she was not a casual observer. *Id.* (finding it relevant that witness was more than just a casual observer). Her attentiveness during the first controlled purchase would have been heightened because she was there solely to complete the transaction. Further, she noted at the hearing that she, as an addict, closely observed her suppliers' faces. Morrison identified Mack in the photo only moments after the first controlled purchase at the Barnes and Noble and a day after exchanging marijuana for crack in the La Quinta. *Id.* (finding a three-day period between the identification and the crime short). Accordingly, three of the five factors are satisfied.

Mack's challenge to the reliability of the identification primarily focuses on the third and fourth factors. Mack argues that the third factor was not satisfied because Morrison's description omitted the scar on Mack's face. Accurate, though general, descriptions are sufficient to satisfy the third factor. *United States v. Brownlee*, 454 F.3d 131, 140 (3rd Cir. 2006) (finding description of the defendant accurate even though it was

14

general); *see also Clark v. Kuhlmann*, 123 Fed. App'x 24, 26 (2d Cir. 2005) (finding witness' description of the defendant sufficient even though witness misidentified the defendant as Hispanic). Morrison identified Mack as an African American male of medium height and medium build. Though vague, this is a fairly accurate description: Mack is approximately 5'11" and weighs 220 pounds. The Court finds little significance in Morrison's failure to mention Mack's scar. Accordingly, her failure to identify the scar is not the type of omission that would undercut the reliability of her description. This Court finds Morrison's description sufficiently accurate.

Making much out of the fact that Morrison pronounced the man in the picture's name as "Bi-low" instead of "B-Low" and misunderstood Dolo's reference to "Bam" during the second controlled purchase, Mack contends that the fourth factor was not met. At the hearing Morrison blamed her lingering southern accent for identifying the man in the picture as "Bi-Low" rather than "B-Low." She clarified that she meant "B-Low." The Court accepts that Morrison's southern drawl added the extra vowel to her first identification. Misunderstanding Dolo's reference to "Bam," in no way undercuts Morrison's December 14 identification. It is apparent that Mack goes by "B-Low"

and "Bam" and that Mack shares "Bam" with another Vermont dealer. Neither Morrison's accent nor her misunderstanding discredited her identification. Morrison immediately and unequivocally identified the man in the picture. At the hearing she stated that she was one hundred percent certain that she correctly identified Mack. Accordingly, the fourth factor is satisfied.

In sum, while the single photograph may have been suggestive, it does not raise a substantial likelihood of misidentification because there is considerable evidence that the identification was independently reliable. Accordingly, Mack's motion to suppress the identification is **denied**.

### B. Motion to Suppress Statements

Mack urges this Court to suppress his statements following the December 29 traffic stop. Specifically, Mack contends that Merchand coerced his consent and decision to remain with the vehicle, and, therefore, his subsequent statements must be suppressed.

Consent is one of several exceptions to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1967). However, to be effective, consent must be voluntary. *Id.* at 248 ("The Fourth and Fourteenth Amendments require that [the Government] demonstrate that the consent was

in fact voluntarily given, and not the result of duress or coercion, express or implied."). The voluntariness of consent is determined by inquiry into the totality of the circumstances. *Id.* at 248-249. Advising a defendant that a warrant could be obtained if consent is withheld does not vitiate a later consent if the officer had a well-founded belief that probable cause existed. *See, e.g., United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (finding consent voluntary because "advising a person of the fact that a search warrant can be obtained does not constitute coercion"); *United States v. Faruolo*, 506 F.2d 490, 493-95 (2d Cir. 1974).

There was sufficient evidence for Merchand to obtain a warrant. Merchand smelled marijuana emanating from the vehicle, the motorists admitted to smoking marijuana, and a drug-sniffing dog reacted to the vehicle. Accordingly, Merchand had a well-founded belief that he had probable cause to obtain a warrant, and, therefore, his initial claim that he would seek a warrant if consent was withheld did not render Mack's consent involuntary.

Mack's argument does not end there, though. Citing *Untied States v. Place*, 462 U.S. 696 (1983), Mack argues that Merchand coerced his consent and decision to remain with the vehicle by fabricating the choice between consenting and remaining with the

vehicle while officers completed a search or withholding consent and being deprived of his vehicle for more than a day.

In *Place*, agents at LaGuardia Airport informed Place that they believed he was carrying narcotics. *Id.* at 698-99. Place refused the agents' request to search his luggage, so the agents seized his luggage, told him that they would attempt to obtain a warrant, and asked him whether he wanted to accompany them to the magistrate. *Id.* Place declined, and the agents took the luggage to John F. Kennedy International Airport to subject it to a dog sniff; the dog indicated the presence of narcotics. *Id.* at 699. Ninety minutes elapsed and it became too late to obtain a warrant. *Id.* The agents held the bags over the weekend, obtained a warrant Monday morning, and discovered cocaine in one of the bags. *Id.*

Place argued that the warrantless seizure of his bags on reasonable suspicion violated his Fourth Amendment rights. *Id.* The Supreme Court held that the Fourth Amendment did not prevent seizure of travelers' luggage on less than probable cause; however, the Court found that the seizure of Place's luggage for ninety minutes was unreasonable. *Id.* at 709-710. The Court found relevant the agents' failure to keep Place informed about the process. *Id.* at 710.

*Place* is of little help to Mack. First, in contrast to the agents in *Place*, Merchand had more than a reasonable suspicion

that the vehicle contained narcotics. Second, and also in contrast to *Place*, Mack consented to the search and decided to remain with his vehicle. Merchand and Young made it abundantly clear that Mack was free to leave at any time. Third, unlike the agents in *Place*, Merchand kept Mack informed at every stage of the process. Accordingly, none of the Court's reasoning in *Place* justifies suppression of Mack's statements.

Mack was not coerced into consenting to the search or remaining with the vehicle. Merchand had a well-founded belief that he had probable cause to obtain a warrant. Nothing suggests that Merchand acted in bad faith when he told Mack that he would have to hold the car overnight before applying for a warrant, and holding the car overnight would not have been unreasonable. *Chambers v. Maroney*, 399 U.S. 42, 50 (1970) (finding that when police have probable cause, they may "seize[] and [hold the car] without a warrant for whatever period is necessary to obtain a warrant for the search"). Most importantly, Merchand and Young repeatedly informed Mack that he could leave at any time. At all times, Merchand chose to remain with the vehicle. Under these circumstances, this Court cannot conclude that Merchand coerced Mack into remaining with the vehicle. Accordingly, Mack's Motion to Suppress Statements is **denied**.

## III. CONCLUSION

For the above reasons, this Court **denies** Mack's motion to suppress identification and motion to suppress statements.

Dated at Burlington, in the District of Vermont, this 11th day of January, 2013.

_/s/William K. Sessions III_
William K. Sessions III
U.S. District Court Judge
